WEST, BRADLEY & CARY MANUF'G CO. *v.* ANSONIA BRASS & COPPER CO.

(*Circuit Court, D. Connecticut.* ———, 1880.)

1. CONTRACT—WARRANTY OF QUALITY.

*Assumpsit.*

*Charles R. Ingersoll,* for plaintiff.

*Wooster & Torrance,* for defendant.

SHIPMAN, D. J. This is an action of general *assumpsit* which was tried by the court, the parties having by agreement waived a trial by jury. The plaintiff's account, upon which the suit was brought, is for clock springs of various kinds which were furnished by the plaintiff to the defendant between July 8, 1875, and February 23, 1876, upon the defendant's orders. The principal of the account was $1,552. It is not denied by the defendant that it received the goods which were thus furnished, and that they have not been paid for. The defence is the recoupment of damages resulting from the breach of the plaintiff's warranty of the quality of the clock spring which it sold to the defendant.

In the summer of 1874 the plaintiff, through Mr. Alanson Cary, its authorized agent, solicited from the defendant orders for clock springs. The defendant was largely engaged in the manufacture of clocks. The plaintiff was an extensive steel-spring manufacturer, and had just commenced to make polished clock springs. The defendant had been buying its springs from Edward E. Dunbar, of Bristol. The Dunbar spring was of excellent quality and had a good reputation. Mr. Carey, before any orders were given, showed the defendant

his samples of springs and received specimens of the Dunbar spring, and had two interviews with the defendant's superintendent and the foreman of the movement department at Ansonia, and one interview with the superintendent and the New York agent at New York. At Ansonia, Mr. Cary said that he (meaning the plaintiff) would guaranty his springs to be equal to the Dunbar spring, and that they would run more evenly than those which the defendant was using. It was understood that plaintiff's springs would be but seven and a half feet in length, while the Dunbar spring was nine feet long. The representation and the guaranty of Cary were that his seven-and-a-half-foot spring would be equal in efficiency to the nine-foot spring of Dunbar. The eight-day spring of Dunbar ran with uniformity at least eight days. This guaranty was given as an inducement to the defendant to become the plaintiff's customer. The additional inducements were a lower price than that of the Dunbar spring and an exchange trade.

While these negotiations were going on, and before any orders had been given to the defendant, Mr. Cary sent defendant, on September 24, 1874, one of the plaintiff's clock springs, and wrote the defendant, among other things, as follows: "One thing we can guaranty, that they [the springs] will run more uniform than anything you have ever used, and will, also, guaranty them equal to any French spring made."

Samples were sent by the plaintiff and tested to a certain extent. These negotiations finally culminated in an experimental order for 500 springs, about November 1, 1874, which were sent November 12, 1874, and the defendant replied that he would have them thoroughly tested and give a decision. The test was apparently satisfactory, for orders followed and continued to be given until February 23, 1876, at which date goods to the amount of about $14,450 had been furnished and had been paid for, with the exception of the bill of $1,552, now in suit. During the first part of the time, modifications in thickness and in minor particulars were suggested or directed by the defendant, which suggestions were complied with.

The representations which were made by the plaintiff were not mere expressions of opinon, but amounted to a warranty of quality; and this warranty was not intended to be temporary, and to terminate with the selection of particular sizes and dimensions, but it was intended to be a guaranty, for a reasonable time after the defendant had given its custom, that the plaintiff's springs should be equal in quality and efficiency to the Dunbar springs of nine feet in length, which were used for the same respective purposes. The defendant did not test its movements except by starting them in running order. They were speedily put into cases, or they were boxed and sent to the New York office. There the movements were fitted and were set running. The eight-day movements ran eight days and no inperfection was apparent. They were sold to wholesale dealers, and by them to retailers.

After awhile complaints began to come back to the defendant in regard to these clocks, and it was discovered that the springs lost their elasticity after being wound a number of times, and, being seven and a half or eight feet long, they ran down before the expiration of the eight days. There was a want of permanent power in the spring, but to what the lack was due the plaintiff's witnesses did not know. This defect existed only in the eight-day springs, and it existed both in the time and strike springs. Clocks were returned, orders were countermanded, and defendant subjected to annoyance, loss of reputation, and to direct pecuniary damage. The testimony as to the general annoyance to which it was subjected by reason of this imperfection was abundant. The evidence as to items of direct pecuniary damage was not abundant. The plaintiff's bill and interest thereon, to September 25, 1879, was $1,984.55. The immediate and direct pecuniary damage to the defendant, resulting from the plaintiff's breach of warranty upon said eight-day clock springs, was, with interest from the dates of the respective items of damage, at least the sum of $1,984.55, and I do not find affirmatively that it exceeded said sum.

I therefore find the issue for the defendant, and that judgment should be for the defendant to recover its costs.